IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CITY OF CHICAGO**<br>121 N. LaSalle Street<br>Chicago, IL 60602, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| **FEDERAL EMERGENCY**<br>**MANAGEMENT AGENCY**<br>500 C Street S.W.<br>Washington, D.C. 20472 | ) ) ) ) ) | FILED: JULY 25, 2008<br>08CV4234<br>JUDGE NORGLE<br>MAGISTRATE JUDGE NOLAN |
| **and** | ) ) | AEE |
| **R. DAVID PAULISON**<br>**Administrator of the Federal**<br>**Emergency Management Agency**<br>500 C Street S.W.<br>Washington, D.C. 20472, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR ADMINISTRATIVE REVIEW

### PRELIMINARY STATEMENT

1.     This is a complaint for administrative review pursuant to the Administrative

Procedure Act, 5 U.S.C. § 501, *et seq.*, brought by the City of Chicago ("Chicago").  Chicago

seeks relief from the de-obligation of funds granted to Chicago from the Federal Emergency

Management Agency ("FEMA") for disaster relief at Chicago O'Hare International Airport

("O'Hare"), and Chicago Midway International Airport ("Midway"), occurring in 1999 and

2000.  By denying Chicago's second and final agency appeal, FEMA has upheld the de-

obligation of emergency funds.

2.      From time to time, Chicago must expend large amounts of effort and funds in responding to snow disasters that threaten to shut down O'Hare and Midway, or to affect the flow of air traffic on a national scope.  Ordinarily, FEMA has made available to Chicago federal disaster funds for all or a portion of this expense, when a federal emergency declaration has been made.  However, FEMA now seeks reimbursement, or "de-obligation," of $5,933,683.98 in funds for certain snow storms that struck Chicago, including O'Hare and Midway, in 1999 and 2000.

3.      Chicago has timely appealed and FEMA has, on the occasion of both of Chicago's timely appeals, denied the appeal, albeit in an untimely manner.  Additionally, FEMA has improperly concluded that federal disaster relief funds are unavailable for these snow storms, and instead erroneously claims that this disaster relief should have been funded solely by private airlines.  Further, through a misinterpretation of Chicago's accounting records, FEMA has erroneously determined that Chicago has received certain duplicative reimbursements for these snow storms.  Last, FEMA's improper demand for the reimbursement of $5,933,683.98 in FEMA funds already granted to Chicago includes $46,509.48 of administrative allowance over and above the 75% federal share of the amount expended by Chicago.

4.      Chicago seeks an order setting aside FEMA's actions in de-obligating funding provided to Chicago for disaster relief, on the grounds that FEMA's actions are arbitrary and capricious, an abuse of discretion, and contrary to law; without observance of procedure as required by law; and unwarranted by the facts.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, which provides for original jurisdiction in suits involving questions arising under federal law.

6.      Judicial review is authorized by the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, which provides that any person suffering a legal wrong because of an agency action, or adversely affected or aggrieved by such action, shall be entitled to judicial review thereof. 5 U.S.C. § 702. The Administrative Procedure Act further provides that a final agency action for which there is no adequate remedy in a court is subject to judicial review. 5 U.S.C. § 704.

7.      A May 1, 2008 decision by FEMA, acting in its official capacity, transmitted to Chicago by the Illinois Emergency Management Agency ("IEMA") by cover letter dated May 28, 2008 (the "Final Administrative Decision") (attached hereto as Group Exhibit A), and upholding FEMA's position with respect to de-obligation of emergency funds provided to Chicago, constituted a final decision pursuant to 44 CFR 206.206(b)(2) and a "final agency action" within the meaning of 5 U.S.C. § 704.

8.      Venue in this Court is proper under 28 U.S.C. § 1391(e), because a substantial part of the events or omissions giving rise to Chicago's claims occurred in this judicial district and because Chicago resides in this judicial district within the meaning of the statute.

## PARTIES

9.      Plaintiff Chicago is a municipal corporation which is organized under the laws of the State of Illinois. Chicago owns O'Hare and Midway Airports.

10.    Defendant FEMA is the federal agency designated by the President to provide emergency relief in instances of a federal national disaster.

11.    Defendant R. David Paulison is the current Administrator of FEMA. In that capacity, he is responsible for the overall administration of FEMA. Administrator Paulison is sued in his official capacity.

## FACTUAL BACKGROUND

### The 1999 And 2000 Snow Disasters

12.    On January 1, 1999, a severe snowstorm hit Illinois (the "1999 Snow Disaster"), which threatened to affect the operations of O'Hare and Midway Airports and to interfere with the national air traffic network. On January 8, 1999, and pursuant to an emergency declaration, FEMA made available federal disaster funds for Illinois communities hit by the 1999 Snow Disaster.

13.    Thirty-four Illinois counties, including Cook County, were eligible for federal funding for emergency protective measures related to the snowstorm.

14.    FEMA provided reimbursement through IEMA to governmental units, communities, and certain nonprofit organizations of 75% of the total eligible costs of snow removal equipment operations, contract personnel and equipment, and overtime for permanent personnel. The State and/or local governments were to assume the remaining non-federal share of the costs.

15.    Related emergency protective measures, such as sanding and salting, and police and fire departments' responses, were also eligible for reimbursement.

16.     For the 1999 Snow Disaster, identified as FEMA Disaster No. 3134-EM-IL, Chicago applied for and was awarded $4,797,927 (75% of the $6,397,236 of costs incurred) for removal of snow at O'Hare and Midway.

17.     Then, in December 2000, another severe snowstorm struck the Chicago area, which again threatened to affect the operations of O'Hare and Midway Airports and to interfere with the national air traffic network (the "2000 Snow Disaster"). FEMA included Cook County in a federal disaster declaration for this snowstorm.

18.     For the 2000 Snow Disaster, identified as FEMA disaster No. 3161-EM-IL, Chicago applied for and was awarded $1,089,247 (75% of the $1,452,329 of costs incurred) for removal of snow at O'Hare and Midway.

### *FEMA's Erroneous Claim That The Airlines Were Solely Responsible For Funding The Response To The 1999 And 2000 Snow Disasters*

19.     The Office of Inspector General of the U.S. Department of Homeland Security ("OIG") subsequently conducted an audit of the $5,887,174 of funds disbursed to Chicago in connection with the airport snow removal costs for the 1999 and 2000 Snow Disasters.

20.     During the course of the audit, Chicago received and responded to a subpoena from OIG for records regarding the accounting of these funds. The records provided to OIG demonstrated how the entire $5,887,174 of funds reimbursed to Chicago for the 1999 and 2000 Snow Disasters had been credited to the O'Hare and Midway operational accounts.

21.     The OIG audit concluded that the Airline Use Agreements (the "Use Agreements"), which govern the operation of O'Hare and Midway as between Chicago and the private airlines that use the facilities (the "Airlines"), requires the Airlines to pay for net operating and maintenance expenses, including snow removal.

22.     However, while the Use Agreements require the Airlines to reimburse Chicago for ordinary operating expenses, they do not preclude Chicago's receipt of FEMA disaster funds to reimburse it for catastrophic snowfalls such as the 1999 and 2000 Snow Disasters.  The Use Agreements merely address the allocation of the operating costs of the airport and cannot be used by FEMA to deny availability of FEMA funds for the extraordinary burden taken on to expeditiously remove disastrous amounts of snow in order to minimize impact on the national transportation system.

23.     Despite FEMA's clear obligations to compensate all victims of federally-declared disasters, FEMA agreed with the OIG's finding and notified IEMA of the determination to de-obligate the funds.  In support of this decision, on February 8, 2005, FEMA issued its Region V Audit Resolution, City of Chicago, Illinois, Audit Report Number DD-16-03 (the "February 2005 Resolution"), which was forwarded to Chicago by IEMA with cover letter dated February 22, 2005 (attached hereto as Group Exhibit B.)

**FEMA's Erroneous Claim That Chicago Received Certain Duplicative Reimbursements For The 1999 And 2000 Snow Disasters**

24.     Further, in its February 2005 Resolution, FEMA reached the additional conclusion that Chicago had received certain duplicative funds in reimbursement for its costs in responding to the 1999 and 2000 Snow Disasters.  Specifically, FEMA claimed that Chicago had previously recovered $5,227,359 of the amount it claimed for these Snow Disasters from the Airlines, and did not credit the Airlines once the reimbursement was received from FEMA.

25.     This conclusion is based on a misinterpretation of Chicago's accounting records.  As Chicago amply demonstrated to FEMA, the costs of the 1999 and 2000 Snow Disasters were properly charged to the accounts established for reimbursement to Chicago

for such snow removal operations when they are undertaken in connection with typical

annual snowfalls during the course of ordinary operations of the airports. Then, application

to FEMA was made for reimbursement of the charges for these Snow Disasters, after FEMA

designated them as eligible for FEMA assistance.

26.    When Chicago received the checks reimbursing it for the claims it had made

for the FEMA funds, the previous charges to the airport operations accounts were reversed.

Copies of the journal entries memorializing those reversals were provided to OIG and were

attached to all of Chicago's appeals. FEMA's decisions, however, have ignored these

accounting records.

27.    Despite Chicago having supplied FEMA with sufficient materials to

demonstrate FEMA's error, FEMA continued to insist on the de-obligation of the afore-

mentioned funds.

***The Administrative Appellate History***

28.    On June 13, 2005, the City filed with FEMA, pursuant to that agency's rules

of practice (44 CFR § 206.206), a timely administrative appeal for reconsideration of

FEMA's February 2005 Resolution.

29.    FEMA's rule concerning administrative appeals requires that FEMA respond

to such appeals within 90 days of receipt. Specifically, 44 CFR § 206.206 provides:

> Within 90 days following receipt of an appeal, the Regional Director (for
> first appeals) or Associate Director/Executive Associate Director (for
> second appeals) will notify the grantee in writing of the disposition of the
> appeal or of the need for additional information.

44 CFR § 206.206(c)(3).

30.    Despite the time requirements of 44 CFR § 206.206(c)(3), FEMA notified its

grantee IEMA of its denial of Chicago's appeal for reconsideration on August 2, 2006. This

denial was transmitted to Chicago by IEMA, with cover letter dated August 24, 2006 (the "August 2006 Denial") (attached hereto as Group Exhibit C).

31.     On October 23, 2006, Chicago filed with FEMA, pursuant to that agency's rules of practice (44 CFR § 206.206), a timely second and final appeal for reconsideration of FEMA's decision to de-obligate funds granted to Chicago.

32.     Despite the time requirements of 44 CFR § 206.206(c)(3), FEMA notified its grantee IEMA of FEMA's Final Administrative Decision denying Chicago's second and final appeal for reconsideration on May 1, 2008. This denial was transmitted to Chicago by IEMA, with cover letter dated May 28, 2008. (Ex. A.)

33.     The Final Administrative Decision constituted FEMA's final decision, pursuant to that agency's rules of practice (44 CFR § 206.206), and was issued by FEMA in its official capacity. Chicago has exhausted its administrative remedies, and this Court now has jurisdiction to consider Chicago's claims.

***FEMA's Inconsistent And Unclear Demands***

34.     Last, FEMA has been inconsistent in the amount of money it seeks from Chicago in de-obligation. In its February 2005 Decision and August 2006 Denial, FEMA determined that the amount of de-obligation totals $7,849,566. (Exhibit B, "Conclusion," pg. 6; Exhibit C, pg. 1.) In its Final Administrative Decision, however, FEMA determined that the amount of de-obligation totals $5,933,683.98. (Exhibit A, pg. 1.) FEMA has failed to adequately explain the amount of its claims, how it has arrived at that figure, and why the amount differs between these three decisions.

35.     FEMA has thus provided to Chicago an insufficient record of the basis of its decision to de-obligate funds paid for the 1999 and 2000 Snow Disasters.

## COUNT I

**(Agency Action Contrary to Law –
Deobligation of Funds Granted to Chicago for 1999 and 2000 Snow Disasters)**

36.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37.     Defendants' decision to de-obligate the $5,933,683.98 of funds granted to Chicago by FEMA for Chicago's response to the 1999 and 2000 Snow Disasters is arbitrary and capricious, an abuse of discretion, and contrary to law; is without observance of the procedure required by law; and is unwarranted by the facts.

### REQUEST FOR RELIEF

**WHEREFORE,** plaintiff prays that this Honorable Court:

A.     Enter an order setting aside FEMA's actions in de-obligating the $5,933,683.98 of funds granted to Chicago by FEMA for Chicago's response to the 1999 and 2000 Snow Disasters, on the grounds that FEMA's actions are arbitrary and capricious, an abuse of discretion, and contrary to law; without observance of procedure as required by law; and unwarranted by the facts.

B.     Retain jurisdiction over this action for such additional and supplemental relief as may be required to enforce the order and judgment; and

C.     Award plaintiff such other relief as may be just and proper.

Dated: July 25, 2008

Respectfully submitted,
MARA S. GEORGES
Corporation Counsel, City of Chicago

By:

DIANE M. PEZANOSKI
Deputy Corporation Counsel
ARDC # 6190003
ESTHER TRYBAN TELSER
Senior Counsel
ARDC # 6202030
AMBER ACHILLES RITTER
Assistant Corporation Counsel
ARDC # 6269304
30 N. LaSalle St.
Suite 900
Chicago, Illinois 60602
(312) 744-5218

# IEMA

**Illinois Emergency Management Agency**

**Rod R. Blagojevich,** Governor

**Andrew Velasquez III,** Director

May 28, 2008

Ms. Diane Pezanoski, Deputy Corporation Counsel
City of Chicago, Department of Law
30 North LaSalle Street, Room 900
Chicago, Illinois 60602

Subject:   City of Chicago
           FEMA-3134-031-14000-00
           FEMA-3161-031-14000-00

Dear Ms. Pezanoski:

Please find the attached letter from Mr. Carlos Castillo of the Federal Emergency Management Agency (FEMA) regarding the City of Chicago's second appeal of the audit findings deobligated under Project Worksheets (PWs) 7056-0 and 1494-0. FEMA has denied the City of Chicago's appeal saying the City did not support its claim that it had not received duplicative reimbursement from the airlines.

The following is a summary of the funding deobligated:

| Declaration | PW | Total Amount (100%) | Federal Share (75%) | Admin. Allowance | Total Return (FS + Admin) |
|---|---|---|---|---|---|
| 3134 | 7056-0 | $6,397,236.00 | $4,797,927.00 | $31,986.18 | $4,829,913.18 |
| 3161 | 1494-0 | $1,452,330.00 | $1,089,247.50 | $14,523.30 | $1,103,770.80 |
| Totals | | $7,849,566.00 | $5,887,174.50 | $46,509.48 | $5,933,683.98 |

Based on this determination, the City of Chicago must return $5,933,683.98 in Federal share and administrative allowance funding associated with these audit findings. Please make the check out to the "Federal Emergency Management Agency" and return it to my attention at the address below.

If you have any questions, please call me at (217) 782-6594.

Sincerely,

David L. Smith, Chief
Bureau of Disaster Assistance & Preparedness

DLS:cnc
Enclosure





PLAINTIFF'S
EXHIBIT
A





U.S. Department of Homeland Security
500 C Street, SW
Washington, DC 20472

MAY 1    2008

Mr. David L. Smith
Chief of Disaster Assistance and Preparedness
Illinois Emergency Management Agency
1035 Outer Park Drive
Springfield, Illinois 62701-1109

Re:    Second Appeal—City of Chicago, PA ID 000-00834-00, Duplication of Benefits,
       FEMA-3134/3161-EM-IL, Project Worksheets (PW) 7056 and 1494

Dear Mr. Smith:

This is in response to your letter dated October 24, 2006, which transmitted the referenced
second appeal on behalf of the City of Chicago (Applicant). The Applicant is appealing the
Department of Homeland Security's Federal Emergency Management Agency's (FEMA) de-
obligation of funding in PWs 7056 and 1494 for snow removal at the Applicant's O'Hare and
Midway Airports following severe snow storms in January 1999 and December 2000.

The Department of Homeland Security's Office of the Inspector General (OIG) conducted an
audit (DD-16-03) of the Applicant's grants and determined that $7,849,565 in snow removal
costs was a duplication of benefits based on the Airline Use Agreements between the Applicant
and the two airport facilities. The audit concluded that the Airline Use Agreements establish that
the airlines are required to pay for net operating and maintenance expenses, including costs for
snow removal. FEMA agreed with the finding and notified the Illinois Emergency Management
Agency of the determination to de-obligate the funds on February 8, 2005. PW 7056 de-
obligated $6,397,236 for FEMA-3134-EM-IL. PW 1494 de-obligated $1,452,330 for FEMA-
3161-EM-IL.

The Applicant submitted its first appeal on June 13, 2005. It challenged the findings of the OIG
audit and claimed that it did not receive duplicative payment for these snow removal costs from
the airlines. The appeal also asserted that it is FEMA's responsibility to pay for these costs. The
Regional Director denied the appeal on August 2, 2006, because the agreements did not relieve
the airlines of the responsibility to fund snow removal work and because the Applicant failed to
provide documentation establishing that a duplication of benefits had not occurred.

David L. Smith

Page 2

The Applicant submitted its second appeal on October 23, 2006. The Applicant failed to provide any additional information to support its claim that it had not received duplicative reimbursement from the airlines. We have reviewed all information submitted with the Applicant's second appeal and have determined that the conclusion of the OIG's audit and the Regional Director's decision in the first appeal are correct. The provisions in the Airline Use Agreements establish that the airlines are required to pay for net operating and maintenance expenses, including costs for snow removal. The Applicant failed to provide any additional information to support its claim that it had not received duplicative reimbursement. Further, the OIG audit shows that the Applicant had credited the airlines the amount of the assistance provided by FEMA for the snow removal work, indicating that a duplication of benefits had occurred. For these reasons, this second appeal is denied.

Please inform the Applicant of my decision. My determination constitutes the final decision on this matter as set forth in 44 CFR §206.206.

Sincerely,

Carlos J. Castillo
Assistant Administrator
Disaster Assistance Directorate

cc:     Edward G. Buikema
        Regional Administrator
        FEMA Region V

# FEDERAL EMERGENCY MANAGEMENT AGENCY
## PROJECT APPLICATION SUMMARY (P.2)
### DISASTER #:    3134

PACKAGE NO:    67

P.A. ID:    031-14000-00    APPLICANT: CHICAGO, CITY OF

| PW# | VSN | CAT | INF | COST SHR | PROJECTED COMPL DATE | APPROVED PW AMOUNT |
|-----|-----|-----|-----|----------|----------------------|--------------------|
| 7056 | 0 | B | N | N | 07/08/1999 | ($6,397,236.00) |

**Site Number: 1**

DAMAGED FACILITY:    O'HARE AND MIDWAY AIRPORTS

FACILITY LOCATION:    JURISDICTION WIDE

SCOPE OF WORK:    THE CITY OF CHICAGO APPEALED THE INSPECTOR GENERAL AUDIT FINDINGS ON JUNE 14, 2006. AFTER FURTHER REVIEW AND CORRESPONDENCE WITH THE OFFICE OF THE INSPECTOR GENERAL AND THE OFFICE OF GENERAL COUNCIL THE REGIONAL DIRECTOR DENIED THE CITY'S APPEAL.

THIS PROJECT WORKSHEET DE-OBLIGATES FUNDING DETERMINED TO BE A DUPLICATION OF BENEFITS PER OFFICE OF THE INSPECTOR GENERAL AUDIT REPORT DD-16-03, DATED 1/24/05 AND UPHELD ON FIRST APPEAL, DATED AUGUST 2, 2006.

| 1 PW | $ AMOUNT ELIGIBLE | $ FEDERAL SHARE |
|------|-------------------|-----------------|
| PWs: | ($6,397,236.00) | ($4,797,927.00) |
| SUBGRANTEE ADMIN EXP: | ($31,986.18) | ($31,986.18) |
| TOTAL: | ($6,429,222.18) | ($4,829,913.18) |

GRAND TOTAL:    1 PW

| | $ AMOUNT ELIGIBLE | $ FEDERAL SHARE | |
|------|-------------------|-----------------|---|
| PWs: | ($6,397,236.00) | ($4,797,927.00) | |
| SUBGRANTEE ADMIN EXP: | ($31,986.18) | ($31,986.18) | GRANTEE |
| TOTAL: | ($6,429,222.18) | ($4,829,913.18) | ADMIN EXP: ($24,149.56) |

APPROVED BY:    LAWRENCE BAILEY    DATE:    08/23/2006

DISASTER RECOVERY MANAGER

**FEDERAL EMERGENCY MANAGEMENT AGENCY**
**PROJECT APPLICATION SUMMARY (P.2)**
**DISASTER #:   3161**

PACKAGE NO:   118

P.A. ID:   031-14000-00   APPLICANT: CHICAGO, CITY OF

| PW# | VSN | CAT | INF | COST SHR | PROJECTED COMPL DATE | APPROVED PW AMOUNT |
|-----|-----|-----|-----|----------|----------------------|--------------------|
| 1494 | 0 | B | N | N | 07/17/2001 | ($1,452,330.00) |

**Site Number:  1**

DAMAGED FACILITY:   OHARE / MIDWAY AIRPORTS

FACILITY LOCATION:   JURISDICTION- WIDE

SCOPE OF WORK:   THE CITY OF CHICAGO APPEALED THE INSPECTOR GENERAL AUDIT FINDINGS ON JUNE 14, 2006. AFTER A LENGTHY REVIEW AND CORRESPONDENCE WITH THE OFFICE OF THE INSPECTOR GENERAL AND THE OFFICE OF GENERAL COUNCIL THE REGIONAL DIRECTOR DENIED THE APPEAL.

THIS PROJECT WORKSHEET DE-OBLIGATES FUNDING DETERMINED TO BE A DUPLICATION OF BENEFITS PER OFFICE OF THE INSPECTOR GENERAL AUDIT REPORT DD-16-03, DATED 1/24/05 AND UPHELD ON FIRST APPEAL, DATED AUGUST 2, 2006.

| | $ AMOUNT ELIGIBLE | $ FEDERAL SHARE |
|-----|-------------------|-----------------|
| 1 PW PWs: | ($1,452,330.00) | ($1,089,247.50) |
| SUBGRANTEE ADMIN EXP: | ($14,523.30) | ($14,523.30) |
| TOTAL: | ($1,466,853.30) | ($1,103,770.80) |

GRAND TOTAL:   1 PW

| | $ AMOUNT ELIGIBLE | $ FEDERAL SHARE | |
|-----|-------------------|-----------------|-----|
| PWs: | ($1,452,330.00) | ($1,089,247.50) | |
| SUBGRANTEE ADMIN EXP: | ($14,523.30) | ($14,523.30) | |
| TOTAL: | ($1,466,853.30) | ($1,103,770.80) | GRANTEE ADMIN EXP: ($5,518.85) |

APPROVED BY:   LAWRENCE BAILEY   DATE:   08/23/2006
DISASTER RECOVERY MANAGER

08CV4234
JUDGE NORGLE
MAGISTRATE JUDGE NOLAN
AEE



**Rod R. Blagojevich, Governor**

**William C. Burke, Director**

February 22, 2005

Mr. Frank Lindbloom, Budget Analyst
City of Chicago
121 North LaSalle Street, Room 604
Chicago, Illinois 60602

      Subject:     City of Chicago
                   FEMA-3134-031-14000-00
                   FEMA-3161-031-14000-00

Dear Mr. Lindbloom:

      Please find the enclosed letter and documents from the Federal Emergency Management
Agency (FEMA) regarding their findings under Audit Report No. DD-16-03. Based on the
information provided, FEMA is notifying us that deobligations will be made under the City of Chicago's
Public Assistance Program subgrants for the FEMA-3134-EM-IL and FEMA-3161-EM-IL snow
emergency declarations. These deobligations are being made due to duplicate benefits.

      Once the Project Worksheets (PWs) have been prepared and approved by FEMA (making
the deobligations), the Illinois Emergency Management Agency (IEMA) will forward your organization
copies and you will have an opportunity to appeal the determinations. If your organization does not
choose to submit an appeal or your appeals are denied, you will be required to return the full Federal
share and administrative allowance associated with the funding deobligated.

      If you have any questions, please call me at (217) 782-8719.

                Sincerely,

                Curtis Caldwell
                Public Assistance Officer

CNC:cnc

Enclosures



U.S. Department of Homeland Security
Region V
536 South Clark Street, Floor 6
Chicago, IL 60605

 FEMA

FEB 0 8 2005

Mr. William Burke, Director
Illinois Emergency Management Agency
110 East Adams Street
Springfield, IL 62701-1109

**RECEIVED**

FEB 17 2005

**IEMA
FINANCE**

Re:    Audit Resolution
       City of Chicago, Illinois
       Audit Report Number DD-16-03

Dear Mr. Burke:

The enclosed memorandum, dated January 24, 2005, from the Office of the Inspector
General (OIG) informed Region V that there was a duplication of benefits for the City of
Chicago for snow emergencies EM-3134 and EM-3161. The OIG's finding is based on
the results of a review of information subpoenaed from the City in May, 2004. Based on
the finding, the Region will de-obligate $6,397,236 for EM-3134 and $1,452,330 for EM-
3161.

Should the City choose to appeal this action, please request it to do so in accordance with
the provisions of 44CFR, Section 206.206. If there are any questions please contact
Larry Bailey at (312) 408-5582, or me.

Sincerely,

Edward G. Buikema
Regional Director

Attachment

*LOG # 42*          JAN 2 6 2005          *Office of Inspector General*



**U.S. Department of Homeland Security**
Dallas Field Office, Office of Audits
3900 Karina Street, Room 224
Denton, Texas 76208

# Homeland Security

January 24, 2005

MEMORANDUM FOR:     Edward G. Buikema
                    Regional Director, FEMA Region V

FROM:               *Tonda L. Hadley*
                    Tonda L. Hadley
                    Field Office Director

SUBJECT:            Audit Resolution
                    *City of Chicago, Illinois*
                    *Audit Report Number DD-16-03*

We have reviewed the documentation provided by the City of Chicago (City) in response to the Office of Inspector General (OIG) subpoena for additional information on Finding A: Duplicate Benefits in the subject audit report. The purpose of our review was to determine (1) what portion of the $7,849,566 questioned in Finding A, if any, did the City actually recover as duplicative of the FEMA money for snow removal; and (2) what additional amount, if any, would have been available for recovery under the "commercially reasonable manner" standard.

We determined that the City actually recovered $5,227,359 of the $7,849,566 we questioned in Finding A. We also determined that all of the $7,849,566 would have been available for recovery under the "commercially reasonable manner" standard. Accordingly, $5,227,359 of the costs claimed was an outright duplication of benefits. Further, the City's failure to charge the airlines the remainder of the costs did not mitigate the airlines' contractual obligations to pay these costs nor diminish the City's ability to receive payment had they charged the costs to the airlines. Therefore, the remaining $2,622,207 (7,849,566-5,227,359) claimed was also a duplication of benefits under the "commercially reasonable manner" standard. Recovery of the full cost of the snow event would not have required the City to exercise any more vigilance than that which the City exercised to recover the $5,227,359 that the City did recover.

The results of this extended work only served to fortify our original position. According to the "Airline Use Agreements," the airlines were responsible for these costs. Therefore, FEMA funding of this work constituted a duplication of benefits. Accordingly, we continue to recommend that the FEMA Regional Director, in coordination with the Illinois Emergency Management Agency, disallow $7,849,566 of questioned costs as the result of this duplication of benefits.

## Background

OIG audit report DD-16-03 presented our findings of a review of Federal Emergency Agency (FEMA) disaster numbers 3134-EM-IL and 3161-EM-IL. Under FEMA disaster number 3134-EM-IL, the City received an award of $14.45 million from the Illinois Emergency Management Agency (IEMA), a FEMA grantee, for snow removal resulting from record or near record snowfall that began on January 1, 1999. The award provided 75 percent FEMA funding for Category B (emergency) work performed during the 48-hour emergency period of January 2, 1999, and January 3, 1999. Under FEMA disaster number 3161-EM-IL, the City received an award of $3.44 million from IEMA, for snow removal resulting from record or near record snowfall that began on December 10, 2000. The award provided 75 percent FEMA funding for Category B work performed on December 13, 2000, and December 14, 2000. The entire text of Finding A: Duplicate Benefits was included for the readers' convenience.

### Finding A: Duplicate Benefits

The City's claim under FEMA disaster number 3134-EM-IL included $6,397,236 in costs that were duplicate benefits. These costs were for snow removal at the two airport facilities that were the responsibility of the airlines using the facilities. The "Airline Use Agreements" between the City and its two airport facilities, Chicago O'Hare[1] and Midway[2], require airline companies to pay all expenses incurred by the City for the net cost of operating, maintaining, and developing the airport. Section 312 of the Stafford Act, Duplication of Benefits, prohibits any person, business concern, or other entity from receiving assistance that duplicates benefits available for the same purpose from any other source. According to the "Airline Use Agreements," the airlines were legally responsible for these costs. Therefore, FEMA funding of this work constituted a duplication of benefits.

During the course of this audit, the OIG discovered that the City had filed a subsequent claim for snow removal work the following year under FEMA disaster number 3161-EM-IL. After performing a limited review of costs claimed under the subsequent disaster, the OIG determined that the City claimed an additional $1,452,330 in costs for snow removal at airport facilities. Because the "Airport Use Agreements" extend to 2012 and beyond, these costs were also a duplication of benefits. Accordingly, the OIG questioned $7,849,566 ($6,397,236 + $1,452,330) as duplicate benefits received under the two disasters.

## Criteria

Criteria relevant to the claims questioned in Finding A: Duplicate Benefits are:

- Code of Federal Regulations (CFR), Title 44, Chapter 1, Part 206, Subpart H, Section 223, General work eligibility.

  (a) *General.* To be eligible for financial assistance an item of work must:
      (3) Be the legal responsibility of an eligible applicant.
  (b) *Public entities.* Facilities belonging to a public entity may be eligible for assistance when the application is submitted through the State or a political subdivision of the State.

---

[1] Chicago-O'Hare International Airport, Amended and Restated Airport Use Agreement and Terminal Facilities Lease, effective date May 12, 1983, termination date May 11, 2018.
[2] Chicago Midway Airport, Amended and Restated Airport Use Agreement and Facilities Lease, effective date January 1, 1997, termination date December 31, 2012.

- The Robert T. Stafford Disaster Assistance and Emergency Relief Act, as amended, 42 U.S.C. 5121, et seq., Subchapter III--Major Disaster and Emergency Assistance Administration

  § 5155. DUPLICATION OF BENEFITS {Sec. 312}
  (a) General prohibition.
  The President, in consultation with the head of each Federal agency administering any program providing financial assistance to persons, business concerns, or other entities suffering losses as a result of a major disaster or emergency, shall assure that no such person, business concern, or other entity will receive such assistance with respect to any part of such loss as to which he has received financial assistance under any other program or from insurance or any other source.

  (c) Recovery of duplicative benefits.
  A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source.

- Hawaii v. FEMA, 294 F.3d 1152 (2002)[3].

  One US Court of Appeals (the Ninth Circuit) has interpreted Section 312 of the Stafford Act, the prohibition on duplication of benefits, and that decision provides guidance relevant to the Chicago airport case. The court agreed with FEMA that "benefits available" in the statute might, under some circumstances, require a disaster victim to reimburse FEMA for more than just the benefits it received from another source. The court held that section 312 which requires reimbursement for any relief that was "available to the person for the same purpose from another source" requires the aid recipient to reimburse FEMA both for duplicate benefits actually received and any benefits that it would have obtained acting in a commercially reasonable manner. Factors to be considered when determining "commercially reasonable manner" include risk, cost, and uncertainty. Section 312 does not require a disaster victim to be more vigilant in recovering dollars for the federal government than it would be recovering money for itself.

  The question on duplication of benefits then becomes what, if any, amount did the City actually recover as duplicative of the FEMA money for snow removal and what additional amount, if any, would have been available applying the "commercially reasonable manner" standard.

## DOCUMENTATION

Documentation provided by the City used to support this discussion included:

---

[3] Case summary and attorney opinion provided by OIG Office of Counsel

- Copies of various FY 1999 trial balance printouts with various snow event transactions highlighted. (Summarized in Tables A and B.)
- A table of total expense for the FY 2000 snow event. (Reproduced as Table C.)
- Copies of "journal entry forms" for budget FY 1999 and 2001. (Summarized in Table D.)
- Copies of various pages of the 12/13/99 trial balance. (Extracts in Table E.)
- Copies of the FY 1999 & 2000 "long forms' for Midway and draft long forms for O'Hare. (Extracts in Tables F and G.)

## DISCUSSION

Even though the subject of this review is the snow events for 2 years at two airport facilities, this discussion is primarily limited to the snow event of FY 1999 as related to the O'Hare airport facility. The reasoning for this limitation is multi-faceted:

- The verbiage of the two Use Agreements was very similar.
- The City's counsel had previously agreed that the Airport Use Agreement language (sample below) contractually binds the airlines to pay the subject costs.[4]

> "The aggregate of all rentals, fees and charges to be paid under all Airport Use Agreements by all Airline Parties shall be sufficient to pay for the net cost of operating, maintaining and developing the Airport (excluding the Land Support Area), including the satisfaction of all of City's obligations to make deposits and payments under any ordinance or resolution authorizing obligations issued pursuant to Article VIII other than Special Facility Revenue Bonds."[5]

- The amounts applicable to the Midway facility were small relative to O'Hare.
- The FY 2000 documentation provided by the City was incomplete.
- The City's calculation methodology was essentially the same for both facilities and fiscal years; therefore, additional explanation would be repetitive.
- The City's methodology for calculating the airline fees appears complicated to an outsider and additional explanation could confuse rather than clarify the issue.

The data in Tables A and B show that the City's Aviation Department incurred costs of approximately $20.5 million for the FY 1999 snow event of which the FEMA claim was only 31 percent (approximately $6.4 million). Further, these tables illustrate that the City applied the bulk of the costs to airfield equipment rental (Object 157, Organization 4005 for O'Hare and 4305 for Midway). Additionally, no data was present that demonstrate (nor does the City contend) an accounting methodology difference for the approximate $6.4 million in costs filed for FEMA reimbursement and the remainder of the costs.

The data in Table D illustrate that the City credited only $2,679,249 of the $6,397,236 FY 1999 FEMA claim to an expense account. Further, the expense account to which the City applied the credit was "other operating expense" instead of the account to which the City originally applied

---

[4] Esther E. Tryban Telser, Senior Counsel City of Chicago, agreed to this stipulation in a telephone conference call with OIG audit staff and OIG counsel.
[5] Chicago-O'Hare International Airport Amended and Restated Airport Use Agreement and Terminal Facilities Lease, Article V, Section 5.01a, pp 30,31.

(debited) the majority of the expenses. Based on an internal memorandum[6], the City applied the remainder of the aviation claim to corporate (fund 100), water (fund 200), and sewer (fund 314).

Likewise, the data in Table D demonstrate that only $1,240,515 of the $1,452,330 FY 2000 FEMA claim was credited to an expense account. The City performed this credit to an account that the City did not use to accumulate the original expense. Additionally, the City did not apply this credit until the subsequent fiscal year, FY 2001.

Table E shows the balances of selected accounts as of the December 13, 1999 trial balance and table F shows the balances of those same accounts that were used for the fee calculations in the FY 1999 "Long Form". By comparing the two tables, the OIG established that the City used approximately $268,000 (37,991,544 vs. 37,723,739) more expenses to calculate the airline fees than those recorded in the December trial balance. This comparison removes any doubt as to whether or not the City performed further account balances adjustments to compensate for the FEMA reimbursement before the calculations were performed to determine the airlines' liability under the Use Agreement. Further, the account balances recorded in Table F along with those shown in Table G substantiate that the entire cost of the snow event (less the aforementioned credit) was included in the airline fee calculation.

Data in Table F also illustrate that 2.2 percent of the indirect costs, including "other operating expense," was allocated to "land support." Since according to the excerpt of the Use Agreement presented in the prior page "land support" was excluded from the calculations, 2.2 percent, or $57,042 (2,592,822*.022) of the credited amount was also excluded from the fee calculations.

## SUMMARY

Based on the data presented heretofore, we concluded that:
- Under the "Use Agreements", the airlines were responsible for all snow event costs.
- The City recorded all snow events costs in the same accounting system and processed them in the same manner.
- The City did credit a portion of the FEMA reimbursement to expense accounts that reduced the airlines' fees. However, the City incorrectly applied the credit for FY 2000 to FY 2001.
- All snow event costs for FY 1999, except those credited and not reallocated, were included in the airline fee calculations and all snow event costs for FY 2000 were included.

The two questions deemed pertinent by OIG counsel are answered below:

- What, if any, amount did the City actually recover as duplicative of the FEMA money for snow removal?

    For FY 1999, the City recovered the claim amount not credited plus the 2.2 percent credited that was allocated to "land support" or $3,775,029 (3,717,987+57,042). For FY 2000, the City recovered the entire claim amount of $1,452,330.

---

[6] Michael E. Harris, Budget Director, Memorandum "FEMA Reimbursement for 1999 Budget" to Phoebe Selden, City Comptroller, dated June 11, 1999.

- What additional amount, if any, would have been available applying the "commercially reasonable manner" standard?

> For both fiscal years, the amount that would have been available applying the "commercially reasonable manner" standard was the entire $7,849,566 (FY1999 $6,397,236 plus FY 2000 $1,452,330). This is evidenced by the fact that the City did recover the bulk of the snow event costs since the FEMA claims amounted to only 31 percent and 27 percent of the total costs for FY 1999 and FY 2000, respectively. Further, since the City did not credit the FY 2000 FEMA claim until FY 2001, it did recover the full amount for FY 2000.

## CONCLUSION

Through inclusion in the fee calculations, the City charged the airlines $5,227,359 (3,717,987+57,042+1,452,330) of the snow event costs claimed as FEMA eligible for both fiscal years; therefore, this amount of the FEMA claim was an outright duplication of benefits. Further, the City's failure to charge the airlines the remainder of the costs did not mitigate the airlines' contractual obligations to pay these costs, nor diminish the City's ability to receive payment had they charged the costs to the airlines. Therefore, the remaining $2,622,207 (7,849,566-5,227,359) in the FEMA claim was also a duplication of benefits under the "commercially reasonable manner" standard. Recovery of the full cost of the snow event would not have required the City to exercise any more vigilance than that which the City exercised to recover the $5,227,359 that the City did recover. According to the "Airline Use Agreements," the airlines were responsible for these costs. Therefore, FEMA funding of this work constituted a duplication of benefits; and FEMA should recover the full $7,849,566 of questioned costs.

### TABLE A – O'HARE FY 1999

| FUND[7] | ACCT TYPE[8] | ORGN[9] | OBJ[10] | TRIAL BALANCE DATE | TRIAL BALANCE PAGE | VOUCHER | AMOUNT |
|---|---|---|---|---|---|---|---|
| 740 | 22 | 4005 | 0157 | 03/31/99 | 2102 | PV998500788 | $ 3,745,157.75 |
| 740 |  | 4005 |  | 03/31/99 | 2103 | PV998500922 | 169,638.25 |
| 740 | 22 | 4005 | 0157 | 03/31/99 | 2102 | PV998500768 | 627,777.75 |
| 740 | . | 4005 |  | 03/31/99 | 2103 | PV998500923 | 576,115.00 |
| 740 | 22 | 4005 | 0157 | 03/31/99 | 2102 | PV998500769 | 144,076.50 |
| 740 |  | 4005 |  | 03/31/99 | 2103 | PV998500924 | 244,287.00 |
| 740 | 22 | 4005 | 0157 | 03/31/99 | 2102 | PV998500715 | 124,130.25 |
| 740 |  | 4005 |  | 03/31/99 | 2103 | PV998500954 | 142,745.00 |
| 740 | 22 | 4005 | 0157 | 03/31/99 | 2102 | PV998500771 | 673,570.00 |
| 740 | 22 | 4005 | 0157 | 03/31/99 | 2102 | PV998500772 | 77,360.00 |
| 740 |  | 4005 |  | 03/31/99 | 2031 | PV998500839 | 1,094,148.75 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500790 | 223,591.75 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500791 | 10,430.00 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500792 | 214,131.75 |
| 740 |  | 4005 |  | 03/31/99 | 2103 | PV998500950 | 56,736.00 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500481 | 219,331.50 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500482 | 794,987.50 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500483 | 81,717.00 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500484 | 146,310.00 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500485 | 82,036.50 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500486 | 315,915.00 |
| 740 | 22 | 4005 | 157 | 03/31/99 | 2102 | PV998500645 | 70,679.00 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1244 | PV998500230 | 74,966.25 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1244 | PV998500506 | 73,097.50 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1336 | PV998500770 | 493,432.50 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1336 | PV998501131 | 62,656.00 |
| 740 |  | 4005 |  | 04/30/99 | 1245 | PV998501193 | 154,900.00 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1336 | PV998501232 | 467,703.25 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1336 | PV998501041 | 9,000.00 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1336 | PV998500789 | 584,710.00 |
| 740 |  | 4005 |  | 04/30/99 | 1245 | PV998501374 | 51,626.00 |
| 740 |  | 4005 |  | 04/30/99 | 1245 | PV998501400 | 77,587.50 |
| 740 |  | 4005 |  | 04/30/99 | 1245 | PV998501401 | 364,695.50 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1336 | PV998501132 | 68,780.00 |
| 740 |  | 4005 |  | 04/30/99 | 1245 | PV998501133 | 76,624.00 |
|  |  |  |  |  |  | SUBTOTAL | $12,394,650.75 |

---

[7] Fund - 740 O'Hare, 610 Midway
[8] Account Type – 22 Expenditure & Expense
[9] Organization – 4005 O'Hare Airfield, 4020 O'Hare Terminal Support, 2005 Other Operating Expense, 4305 Midway Airfield, 4350 Midway Parking &Roadway
[10] Object – 157 Equipment Rental, 161 Repair Facility

## TABLE A – O'HARE FY 1999
(continued)

| FUND | ACCT TYPE | ORGN | SRCE | TRIAL BALANCE DATE | TRIAL BALANCE PAGE | VOUCHER | AMOUNT |
|------|-----------|------|------|--------------------|--------------------|---------|--------|
| 740 |    | 4005 |     |          |      | SUBTOTAL | $12,394,650.75 |
| 740 |    | 4005 |     | 04/30/99 | 1245 | PV998501134 | 315,836.50 |
| 740 |    | 4005 |     | 04/30/99 | 1245 | PV998501135 | 62,274.50 |
| 740 | 22 | 4005 | 157 | 04/30/99 | 1336 | PV998501219 | 394,717.50 |
| 740 |    | 4005 |     | 04/30/99 | 1245 | PV998501153 | 73,094.00 |
| 740 |    | 4005 |     | 04/30/99 | 1245 | PV998501158 | 111,557.00 |
| 740 | 22 | 4020 | 157 | 04/30/99 | 1338 | PV998501088 | 37,342.50 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2487 | PV998500504 | 77,227.18 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2583 | PV998501303 | 53,838.00 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2487 | PV998501982 | 108,378.50 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2487 | PV998501983 | 49,696.00 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2487 | PV998501984 | 245,680.00 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2487 | PV998501985 | 274,536.00 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2583 | PV998501742 | 334,618.50 |
| 740 | 22 | 4005 | 157 | 05/31/99 | 2583 | PV998501743 | 142,436.50 |
| 740 | 22 | 4005 | 161 | 06/30/99 | 2585 | PV998500719 | 101,354.00 |
| 740 | 22 | 4005 | 157 | 06/30/99 | 2585 | PV998501227 | 113,875.74 |
| 740 | 22 | 4005 | 161 | 06/30/99 | 2585 | PV998501407 | 23,613.00 |
| 740 | 22 | 4005 | 157 | 06/30/99 | 2585 | PV998502019 | 57,225.75 |
| 740 | 22 | 4005 | 157 | 06/30/99 | 2585 | PV998502020 | 195,787.00 |
| 740 | 22 | 4005 | 157 | 06/30/99 | 2585 | PV998502041 | 523,612.50 |
| 740 | 22 | 2005 | 157 | 06/30/99 | 2686 | PV998502416 | 244,275.00 |
| 740 | 22 | 2005 | 157 | 06/30/99 | 2686 | PV998502432 | 135,935.00 |
| 740 | 22 | 2005 | 157 | 06/30/99 | 2686 | PV998502042 | 1,349,479.50 |
| 740 | 22 | 4005 | 157 | 07/31/99 | 2504 | PV998502120 | 75,592.50 |
| 740 | 22 | 4005 | 157 | 07/31/99 | 2611 | PV998502781 | 4,158.00 |
| 740 | 22 | 4005 | 157 | 07/31/99 | 2611 | PV998502782 | 5,355.50 |
| 740 | 22 | 4005 | 157 | 07/31/99 | 2504 | PV998502851 | 37,754.50 |
| 740 | 22 | 4005 | 157 | 07/31/99 | 2504 | PV998502852 | 40,678.70 |
| 740 | 22 | 2005 | 157 | 07/31/99 | 2605 | PV998502850 | 147,189.95 |
| 740 | 22 | 4005 | 157 | 08/31/99 | 3336 | PV998550125 | 12,692.25 |
| 740 |    | 4005 |     | 08/31/99 | 3220 | PV998502345 | 241,147.47 |
| 740 | 22 | 4005 | 157 | 08/31/99 | 3336 | PV998550123 | 3,282.00 |
| 740 | 22 | 4005 | 157 | 08/31/99 | 3336 | PV998550126 | 13,176.50 |
| 740 | 22 | 2005 | 157 | 08/31/99 | 3334 | PV998550124 | 4,464.00 |
| 740 | 22 | 4005 | 157 | 09/30/99 | 2773 | PV998502763 | 249,825.00 |
| 740 | 22 | 4005 | 157 | 09/30/99 | 2773 | PV998550138 | 249,825.00 |
| 740 | 22 | 4020 | 157 | 12/31/99 | 7701 | PV998552023 | 12,000.00 |
|     |    |      |     |          |      | TOTAL | $18,518,182.29 |

## TABLE B – MIDWAY FY 1999

| FUND | ACCT TYPE | ORGN | OBJ | TRIAL BALANCE DATE | TRIAL BALANCE PAGE | VOUCHER | AMOUNT |
|---|---|---|---|---|---|---|---|
| 610 | 22 | 4350 | 157 | 03/31/99 | 0871 | PV998540024A | $   398,366.00 |
| 610 | 22 | 4350 | 157 | 03/31/99 | 0871 | PV998540037 | 32,191.50 |
| 610 | 22 | 4350 | 157 | 03/31/99 | 0871 | PV998540064 | 2,960.00 |
| 610 | 22 | 4350 | 157 | 04/30/99 | 0027 | PV998540205 | 103,208.50 |
| 610 | 22 | 4305 | 157 | 05/31/99 | 1113 | PV998540265 | 443,196.00 |
| 610 | 22 | 4305 | 157 | 05/31/99 | 1113 | PV998540266 | 490,372.00 |
| 610 | 22 | 4305 | 157 | 05/31/99 | 1067 | PV998540400 | 195,802.00 |
| 610 | 22 | 4305 | 157 | 05/31/99 | 1067 | PV998540401 | 153,573.00 |
| 610 | 22 | 4350 | 157 | 12/31/99 | 5610 | PV998541305 | 5,407.50 |
|  |  |  |  |  |  | TOTAL | $1,825,076.50 |

## TABLE C – TOTAL EXPENSE – 2000 SNOW EVENT

| FUND | VENDOR | VOUCHER | AMOUNT |
|---|---|---|---|
| 740 | Rossi Contractor | 008505083 | $    55,300 |
| 618 | Hudson General | 008562301 | 663,162 |
| 742 | Aero Snow | 018500509 | 138,469 |
| 618 | George Beemsterboer | 008562299 | 517,218 |
| 742 | Aero Snow | 008505237 | 203,665 |
| 742 | Milburn Brothers | 008505031 | 4,025 |
| 742 | Milburn brothers | 008505029 | 14,973 |
| 742 | Aero Snow | 018500669 | 158,518 |
| 742 | Hudson General | 018500668 | 196,382 |
| 742 | Milburn Brothers | 008505030 | 259,739 |
|  |  | *TOTAL | $2,211,451 |

\* Michael E. Harris, Budget Director, Memorandum "Snow Emergency - Funding from the Federal Emergency Management Agency (FEMA) to Mayor Richard M. Daley dated April 3, 2001, shows the total Aviation Department cost of the FY 2000 snow event at $5,362,000 of which the FEMA approved costs were $1,452,329 or 27%.

## TABLE D – JOURNAL ENTRIES

| Disaster Number | Total Claimed | Journal Voucher | ORGN | Date | Fiscal Year | Airport | Expense Credit | NOT Credited |
|---|---|---|---|---|---|---|---|---|
| 3134-EM-IL | $6,397,236 | JV63462W7734 | 2005 | 09/16/99 | 1999 | Midway | ($    86,427) |  |
|  |  | JV63462W7734 | 2005 | 09/16/99 | 1999 | O'Hare | ($2,592,822) | $ 3,717,987 |
| 3161-EM-IL | $1,452,330 | JVSR13-0430 | 5305 | 05/29/02 | 2001 | Midway | ($   322,541) |  |
|  |  | JVSR13-0430 | 4005 | 05/29/02 | 2001 | O'Hare | ($   918,001) | $   211,788 |
| TOTAL | $7,849,566 |  |  |  |  |  | ($3,919,791) | $ 3,929,775 |

9

## TABLE E – ACCOUNT BALANCES - 12/13/99 TRIAL BALANCE

| FUND | ACCT | ACCT TYPE | ACT | DEPT | ORGN | BALANCE |
|------|------|-----------|-----|------|------|---------|
| 740 | 157 | 22 - expense | SE99 | 85 | 4005 – Airfield | $ 12,519,007 |
| 740 | 157 | 22 - expense | | 85 | 4005 – Airfield | 6,448,124 |
| | | | | | TOTAL 4005 | $ 18,967,131 |
| | | | | | | |
| 740 | 157 | 22 - expense | | 85 | 4010–Domestic terminal | $ 1,051,818 |
| | | | | | | |
| 740 | 157 | 22 - expense | | 85 | 4015–Inter. Terminal | $ 144 |
| | | | | | | |
| 740 | 157 | 22 - expense | | 85 | 4020-Terminal support | $ 15,973,328 |
| 740 | 157 | 22 - expense | SE99 | 85 | 4020-Terminal support | 119,873 |
| | | | | | TOTAL 4020 | $ 16,093,201 |
| | | | | | | |
| 740 | 157 | 22 - expense | | 85 | 4025-Land support | $ 600 |
| | | | | | | |
| 740 | 157 | 22 - expense | | 85 | 4035-Heating and Air | $ 32,089 |
| | | | | | | |
| 740 | 157 | 22 - expense | | 85 | 4050-Parking & Roads | $ 964,939 |
| | | | | | | |
| 740 | 157 | 22 – expense | | 85 | 2035-Fleet | $ 15,557 |
| | | | | | | |
| 740 | 157 | 22 - expense | | 03 | 2005-Indirect | $ 73,997 |
| 740 | 157 | 22 - expense | | 27 | 2005-Indirect | 417 |
| 740 | 157 | 22 - expense | | 31 | 3006-Indirect | 284 |
| 740 | 157 | 22 - expense | | 35 | 2005-Indirect | 1,424 |
| 740 | 157 | 22 - expense | | 85 | 4045-Indirect | 892,054 |
| 740 | 157 | 22 - expense | | 99 | 2005-Indirect | (374,380) |
| 740 | 157 | 22 - expense | SE99 | 99 | 2005-Indirect | 4,464 |
| | | | | | TOTAL INDIRECT | $ 598,260 |
| | | | | | | |
| | | | | | ACCT 157 TOTAL | $37,723,739 |

## TABLE F – ORGN BALANCES – DRAFT "LONG FORM"

| FUND | ACCT | ACCT TYPE | ORGANIZATION | ACCT 157 BALANCE | ACCT TOTAL BALANCE | ALLOCATE PERCENT |
|------|------|-----------|--------------|------------------|--------------------|------------------|
| 740 | 157 | 22 - expense | 4005 – Airfield | $ 19,033,661 | $ 96,730,566 | 29.8 |
| 740 | 157 | 22 - expense | 4010 – Domestic Terminal | 1,051,818 | 90,410,441 | 32.4 |
| 740 | 157 | 22 - expense | 4015 – International Terminal | 144 | 28,507,686 | 09.9 |
| 740 | 157 | 22 - expense | 4020 - Terminal Support | 18,242,598 | 77,536,388 | 25.7 |
| 740 | 157 | 22 - expense | 4025 – Land Support | 600 | 3,188,738 | 02.2 |
| 740 | 157 | 22 - expense | 4040 – Fleet | 15,557 | 00 | |
| 740 | 157 | 22 - expense | 4035 – Heating and Air | 32,089 | 00 | |
| 740 | 157 | 22 - expense | 4050 – Parking and Roads | 964,939 | 00 | |
| 740 | 157 | 22 - expense | 2005/4045 - Indirect | (1,349,862) | 00 | |
| | | | ACCOUNT 157 TOTAL | $37,991,544 | $296,373,819 | 100.0 |

00 – allocated to organizations 4005 through 4025

## TABLE G – AIRLINE REQUIREMENTS BY COST/REVENUE CENTERS - DRAFT "LONG FORM"

| REQUIREMENTS | 4005 | 4010 | 4015 | 4020 | 4025 | TOTAL |
|--------------|------|------|------|------|------|-------|
| OP & Maint Exp | $ 96,730,566 | $ 90,410,441 | $ 28,507,686 | $ 77,536,388 | $ 3,188,738 | $296,373,819 |
| Debt Service | 41,426,002 | 42,191,285 | 10,091,557 | 37,977,865 | 0 | 131,686,709 |
| Fund Deposits | 2,917,431 | 2,726,814 | 859,805 | 2,338,528 | 0 | 8,842,578 |
| Total Requirement | 141,073,999 | 135,328,540 | 39,459,048 | 117,852,781 | 3,188,738 | 436,903,106 |
| Non-Use Revenue | (11,816,110) | (48,313,332) | (14,731,454) | (110,143,121) | (11,258,595) | (196,262,612) |
| Deficit (Surplus) | 129,257,889 | 87,015,208 | 24,727,594 | 7,709,660 | (8,069,857) | 240,640,494 |
| 4020 Allocations | | 7,322,080 | 387,580 | (7,709,660) | | 0 |
| NET Deficit (Surplus) | $129,257,889 | $94,337,288 | $25,115,174 | $ 0 | ($8,069,857) | $240,640,494 |

# IEMA
## Illinois Emergency Management Agency

[header — court stamp]

**Rod R. Blagojevich, Governor**

**William C. Burke, Director**

August 24, 2006

Mr. Cortez Trotter, Chief Emergency Officer
City of Chicago
121 North LaSalle Street, Room 509
Chicago, Illinois 60602

      Subject:    City of Chicago
                 FEMA-3134-031-14000-00
                 FEMA-3161-031-14000-00
                 Appeal

Dear Mr. Trotter:

      Please find the enclosed letter from the Federal Emergency Management Agency (FEMA) regarding the City of Chicago's appeal of findings identified in the Office of the Inspector General's audit DD-16-03. FEMA has denied the appeal because they were unable to determine that there was not a duplication of benefits.

      In accordance with 44 CFR, 206.206, your organization has the right appeal this determination to the FEMA Associate Director. This appeal must be made in writing within 60 days of receipt of this letter, contain documentation supporting your organization's position and be submitted to:

           Mr. David L. Smith, Chief
           Bureau of Disaster Assistance and Preparedness
           Illinois Emergency Management Agency
           1035 Outer Park Drive
           Springfield, Illinois 62704-4462

      If your organization chooses not to appeal this determination, it must return the funding. FEMA is processing Project Worksheets (PWs) to deobligate these funds from your organization's subgrants under the FEMA-3134-EM-IL and FEMA-3161-EM-IL declarations. Once we receive these PWs, we will forward a copy of each to you, which will indicate the Federal share and administrative allowance to be returned.

      If you have any questions, please contact me at (217) 782-8719.

               Sincerely,

               Curtis Caldwell
               Public Assistance Officer

CNC:cnc
Enclosure
cc:   Ms. Esther Tryban-Telser

**PLAINTIFF'S EXHIBIT**



U.S. Department of Homeland Security
Region V
536 South Clark Street, Floor 6
Chicago, IL 60605

# FEMA

August 2, 2006

Mr. William Burke, Director
Illinois Emergency Management Agency
110 East Adams Street
Springfield, IL 62701-1109

Dear Mr. Burke:

I am in receipt of your letter of June 14, 2005, submitted on behalf of the City of Chicago,
PA ID 031-14000-00, under Emergency Declarations 3134 and 3161. The appeal concerns
U.S. Department of Homeland Security, Office of Inspector General (OIG), Audit Report
DD-16-03, which recommends de-obligation of $7,849,566 in duplicate costs for snow
removal at O'Hare and Midway Airports.

Finding A of the audit stated that the airlines are responsible for paying for snow removal
at the airports under the City of Chicago lease agreement with the airlines. The City of
Chicago actually received $5,227,359 from the airlines and could have recovered the
remaining $2,622,207 from the airlines according to the audit. The applicant's appeal notes
that the FEMA Policy Manual provides that when a lease does not specifically address
responsibility for disaster relief, FEMA presumes the property owner is responsible.
However, the OIG has determined that the agreements between the City's two airports and
the airlines provide that the removal of snow is considered an operation and maintenance
expense. The appeal also notes that the airlines have received full credit from the City for
the $5,887,174, the 75% Federal share of $7,849,566. The OIG contends that this credit
occurred as a result of payment from FEMA and therefore, not an actual cost to the City.

We have reviewed the information submitted by the City. We are not able to determine that
there was not a duplication of benefits or that the agreements do not relieve the airlines of
supporting snow removal efforts. For these reasons, I am denying this appeal. Should the
City choose to file a second appeal, please advise appropriate City Staff of the appeal
procedures outlined in 44 CFR, Part 206.206.

Sincerely,

Edward G. Buikema
Regional Director