IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF CHICAGO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 CV 4234 |
| v. ) | |
| ) | Hon. Charles R. Norgle |
| FEDERAL EMERGENCY MANAGEMENT ) | |
| AGENCY, and W. CRAIG FUGATE, ) | |
| Administrator of the Federal Emergency ) | |
| Management Agency, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |
| ) | |
| UNITED AIR LINES, INC., ) | |
| CONTINENTAL AIRLINES, INC., ) | |
| SOUTHWEST AIRLINES CO., ) | |
| DELTA AIR LINES, INC., ) | |
| AIRTRAN AIRWAYS, INC., and ) | |
| AMERICAN AIRLINES, INC. ) | |
| ) | |
| Plaintiffs in Intervention, ) | |
| ) | |
| v. ) | |
| ) | |
| FEDERAL EMERGENCY MANAGEMENT ) | |
| AGENCY, W. CRAIG FUGATE, Administrator ) | |
| of the Federal Emergency Management Agency, ) | |
| and the CITY OF CHICAGO, ) | |
| ) | |
| Defendants in Intervention. ) | |

## OPINION AND ORDER

Plaintiff City of Chicago (the "City") brings a complaint for administrative review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 501, *et seq.*, against Defendants Federal Emergency Management Agency and its Administrator, W. Craig Fugate[1] (collectively, "FEMA"). In addition, Intervenor Plaintiffs United Air Lines, Inc., Continental Airlines, Inc., Southwest Airlines Co., Delta Air Lines, Inc., Airtran Airways, Inc., and American Airlines, Inc. (collectively, the "Airlines") move for administrative review and other relief against FEMA and the City. Before the Court are FEMA's motions for summary judgment against the City and the Airlines, and the City and the Airlines' cross-motions for summary judgment against FEMA. For the following reasons, FEMA's motions for summary judgment are granted, and the City and the Airlines' cross-motions for summary judgment are denied.

## I. BACKGROUND[2]

Following a snowstorm in 1999 and upon the request of the governor of Illinois, on January 8, 1999, President Clinton issued an emergency declaration for numerous counties in Illinois, including Cook County, which were affected by a severe snowstorm with near-record accumulation. The declaration made the counties eligible for federal funding to help pay for emergency work, including snow removal, undertaken as a result of the storm. Pursuant to agreement, FEMA provided funding for 75% of the cost of emergency work, which included equipment and overtime pay. The City reported that $6,397,236 was spent in Cook County on snow removal at Chicago O'Hare International Airport ("O'Hare") and Chicago Midway International Airport ("Midway"). FEMA provided funds to the City equal to 75% of those

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), W. Craig Fugate, the current Administrator of FEMA, has been automatically substituted for R. David Paulison, the former Administrator of FEMA.
[2] The Court takes the undisputed facts from the parties' Local Rule 56.1 statements and notes disputed facts within the text.

2

expenses, totaling $4,797,927. Approximately two years later, in December of 2000, Chicago experienced another severe snowstorm which resulted in an emergency declaration for Cook County. As a result of this storm, $1,452,330 was spent on snow removal at O'Hare and Midway. FEMA once again provided funds to the City equivalent to 75% of that amount, totaling $1,089,247.

In September of 2003, The Department of Homeland Security's ("DHS") Office of Inspector General ("OIG") conducted an audit of public assistance funds given to the City between January 2, 1999 and January 29, 2002. The OIG concluded that during that period, the City had claimed $7,849,566 in public assistance which constituted a duplication of benefits for emergency snow removal at O'Hare and Midway. Specifically, the audit revealed $6,397,236 in duplicate costs from snow removal at O'Hare and Midway following the January 1999 snow emergency, and $1,452,330 in duplicate costs for snow removal following the December 2000 snow emergency. Despite those findings, it is undisputed that the City only received a total of $5,887,174 in emergency relief from FEMA for the snow removal at O'Hare and Midway, which represented the statutorily designated 75% of the costs for each of the two emergencies.

As a result of the audit, the OIG issued a subpoena to the City on April 30, 2004, in order to ascertain the amount of funds the City recovered from the Airlines for snow removal following the January 1999 and December 2000 snow emergencies. The OIG released an audit resolution on January 24, 2005, determining that the City recovered $5,227,359 of the $7,849,566 in snow removal costs from the Airlines, which constituted an outright duplication of benefits. In addition, the DHS's OIG concluded that the remaining $2,622,207 also constituted a duplication of benefits because the City's "failure to charge the airlines the remainder of the costs did not mitigate the airlines' contractual obligations to pay these costs, nor diminish the

3

City's ability to receive payment had they charged the costs to the airlines." Administrative Record 225.

The contractual obligations between the Airlines and the City are outlined in the Chicago-O'Hare International Airport Amended and Restated Airport Use Agreement and Terminal Facilities Lease (the "O'Hare Use Agreement") and the Chicago Midway Airport Amended and Restated Airport Use Agreement and Facilities Lease (the "Midway Use Agreement") (collectively, the "Use Agreements"). The Use Agreements between the City and the Airlines were in effect at the time of the January 1999 and December 2000 snow emergencies.

The Use Agreements required the City to operate and maintain the airports, including snow and ice removal. See O'Hare Use Agreement § 16.01; Midway Use Agreement § 11.01. In turn, the City charged the Airlines a fee to recover the net costs of maintenance and operation. See O'Hare Use Agreement § 5.01; Midway Use Agreement § 8.02. The fees were based on monthly estimates, and at the end of each fiscal year, the fees paid were compared with actual net costs expended by the City. If the actual net costs were higher, the Airlines were charged the difference, and if the monthly fees exceeded the actual net costs, the City refunded the excess amount to the Airlines. See O'Hare Use Agreement § 7.07; Midway Use Agreement § 9.04. Under the O'Hare Use Agreement, the City was obligated to use its best efforts to minimize the operation and maintenance charges to the Airlines. See O'Hare Use Agreement § 5.01. In the event that a premise used by the Airlines under the agreements was damaged or destroyed, the City was to maintain insurance to cover the costs. If the insurance proceeds proved insufficient to cover the costs of repair, the City was to issue bonds to cover the deficiency. See O'Hare Use Agreement §§ 19.03, 19.04; Midway Use Agreement § 14.01.

4

The City filed an administrative appeal of the audit decision to de-obligate funds with the Director of FEMA's Region V on June 13, 2005. FEMA denied the appeal on August 2, 2006. The City filed a second appeal with FEMA's Disaster Assistance Directorate on October 23, 2006. That appeal was denied on May 1, 2008.

On July 25, 2008, the City filed its complaint for administrative review of FEMA's decision to de-obligate what it considered to be duplicate benefits to the City for the snow removal, based on amounts that the City did or could have recovered from the Airlines. On March 23, 2012, the Airlines filed their intervenor complaint. FEMA moved for summary judgment against the City on December 21, 2009, and against the Airlines on May 22, 2012. The City filed its cross-motion for summary judgment on June 18, 2010, and the Airlines filed their cross-motion for summary judgment on June 28, 2012. The motions are fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

"Cross-motions [for summary judgment] must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." Bloodworth v. Vill. of Greendale, 475 F. App'x 92, 95 (7th Cir. 2012).

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a

jury to return a verdict for that party." Egonmwan v. Cook Cnty. Sheriff's Dep't, 602 F.3d 845, 849 (7th Cir. 2010) (internal quotation marks and citation omitted). The Court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. Benuzzi v. Bd. of Educ. of City of Chi., 647 F.3d 652, 656 (7th Cir. 2011) (citing Groesch v. City of Springfield, Ill., 635 F.3d 1020, 1022 (7th Cir. 2011)). But before the nonmoving party "can benefit from a favorable view of evidence, he must first actually place evidence before the courts." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). Simply showing that there is "some metaphysical doubt as to the material facts" will not defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted); see also Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008).

## B. Scope of Administrative Review

FEMA urges the Court to uphold its administrative decision to de-obligate funds to the City based on its finding that the Airlines' obligations to pay for snow removal constitute a duplication of benefits under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act), 42 U.S.C. §§ 5121-5207. However, the City and the Airlines dispute FEMA's interpretation of the Stafford Act, specifically with regard to the duplicate benefits provision. See 42 U.S.C. § 5155.

Pursuant to the APA, "[t]he reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard is a deferential one that 'presumes that agency actions are valid as long as the decision is supported by a rational basis.'" White Eagle Coop. Ass'n v. Commer, 553 F.3d 467, 474 (7th

Cir. 2009) (quoting Pozzie v. U.S. Dep't of Housing & Urban Dev., 48 F.3d 1026, 1029 (7th Cir. 1995)). "The scope of [a court's] review under this standard is narrow [and] . . . a court is not to substitute its judgment for that of the agency." Judulang v. Holder, 132 S. Ct. 476, 483 (2011) (internal quotation marks and citations omitted). "Agencies . . . have expertise and experience in administering their statutes that no court can properly ignore." Id.

"As a general rule, under the APA, review of an agency's decision is confined to the administrative record to determine whether, based on the information presented to the administrative agency, the agency's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Little Co. of Mary Hosp. v. Sebelius, 587 F.3d 849, 865 (7th Cir. 2009) (citation omitted). Pursuant to Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the Court is confronted with two questions when reviewing FEMA's construction of its governing statute, the Stafford Act. First, the Court must determine "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter" because credit must be given to the "unambiguously expressed intent of Congress." Id. at 842-43. If Congress has not "directly addressed the precise question at issue," then the Court moves to the second question, "whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

"Deference in accordance with Chevron, however, is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency determination claiming deference was promulgated in the exercise of that authority.'" Gonzales v. Oregon, 546 U.S. 243, 255-56 (2006) (citing United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)). "Otherwise, the interpretation is 'entitled to respect' only

to the extent it has the 'power to persuade.'" Id. at 256 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

C. "Available" Funds

   *1. Whether the Use Agreements Required Payment for Emergency Snow Removal*

As an initial matter, the Airlines argue that duplicate funds were not "available" under any statutory interpretation of the word—unambiguous or otherwise—because the Use Agreements did not require the Airlines to pay the City for disaster or emergency snow removal. See 42 U.S.C. § 5155(c) ("A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source." (emphasis added)). However, the City and FEMA agree that, under the provisions of the Use Agreements covering operating and maintenance expenses between the City and the Airlines, the Airlines are obligated to pay the City for the cost of the snow removal that occurred following the January 1999 and December 2000 snow emergencies. See City of Chi. v. Fed. Emergency Mgmt. Agency, 660 F.3d 980, 983 (7th Cir. 2011) ("[T]he City has stipulated with FEMA that the snow removal expenses that the City incurred are covered by a provision of the Use Agreements that makes the Airlines responsible for 'net operating and maintenance expenses' at the airports"). Indeed, while the Use Agreements provide that the City is responsible for the removal of snow and ice as part of its duty to maintain and operate the Airport, the Airlines are specifically required to pay the City fees to reimburse those net costs. See O'Hare Use Agreement § 5.01; Midway Use Agreement § 8.02. Accordingly, the Court rejects the argument that the emergency snow removal in January 1999 and December 2000 would not be covered under the agreement.

### 2. Whether Payment of Emergency Snow Removal Was Commercially Reasonable

In the alternative, the Airlines argue that even if the Use Agreements would normally require them to pay for the cost of snow removal, it was "commercially reasonable" for the City to pursue the funds from FEMA, as opposed to the otherwise <u>available</u> funds from the Airlines. The Airlines rely on the Ninth Circuit in <u>State of Hawaii v. Federal Emergency Management Agency</u>, where the court held that "§ 5155(c) requires disaster aid recipients to reimburse FEMA the duplicative benefits that they actually received and also requires the recipients to reimburse any additional benefits that they would have received had they acted in a commercially reasonable manner." 294 F.3d 1152, 1165 (9th Cir. 2002). In applying the <u>Chevron</u> standard for administrative review, the <u>Hawaii</u> court first concluded that the term "available" in the provision for duplicative benefits in the Stafford Act was ambiguous. Then the court determined the proper construction; that duplicate benefits include those actually received as well as those that a party could have received if it acted in a commercially reasonable manner. <u>Id.</u> at 1161-1165. Because the meaning of "available" is not otherwise contested, for purposes of this motion, the Court assumes that the interpretation in <u>Hawaii</u>, while only persuasive, is accurate.

In applying the standard set forth in <u>Hawaii</u>, the Airlines argue that it would have been commercially <u>un</u>reasonable for the City to have pursued the costs of snow removal from the 1999 and 2000 snow emergencies from the Airlines because "[i]t is doubtful that the City could have successfully charged the Airlines for the disaster snow removal." Intervenor Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. & in Supp. of Their Cross-Mot. for Summ. J. 14. However, the Airlines provide no factual support beyond their mere speculation that the City would have been unable to recover from them. See <u>Montgomery</u>, 626 F.3d at 389 ("[M]ere conclusory allegations do not constitute evidence." (internal citations omitted)). Indeed, as discussed above,

9

the Use Agreements required the Airlines to pay the City for the net costs of maintenance and operation—including snow removal. See O'Hare Use Agreement §§ 5.01, 16.01; Midway Use Agreement §§ 8.02, 11.01. Because the Airlines fail to provide any evidence that it would have been commercially unreasonable for the City to recover the costs of snow removal from them, the Court rejects the argument.

### D. "Benefits" and "Financial Assistance"

Next, the City and the Airlines argue that the duplicative benefits provision does not apply to money from the Airlines because the words "benefits" and "financial assistance" in the provision refers only to other government aid and insurance-like proceeds—not amounts received through a contract between a landlord and a tenant, such as the Use Agreements between the City and the Airlines. In support of the administrative determination to the contrary, FEMA contends that costs paid by the Airlines fall under the specific statutory language of "any other source." The relevant portions of the statute provide that:

> (a) The President, in consultation with the head of each Federal agency administering any program providing <u>financial assistance</u> to persons, business concerns, or other entities suffering losses as a result of a major disaster or emergency, shall assure that no such person, business concern, or other entity will receive such assistance with respect to any part of such loss as to which he has received <u>financial assistance</u> under any other program or from insurance <u>or any other source</u>.
>
> . . .
>
> (c) A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates <u>benefits</u> available to the person for the same purpose <u>from another source</u>.

42 U.S.C. § 5155(a) & (c) (emphasis added). In reviewing FEMA's construction of its governing statute as to the terms "assistance" and "benefits," the Court applies the <u>Chevron</u> two-prong test. See <u>Chevron</u>, 467 U.S. at 842-44.

10

### 1. Congressional Intent

"Under the first step of a Chevron analysis, courts do not defer to even reasonable agency interpretation if 'Congress has spoken directly to the precise point at issue,' i.e., if the statutory language, with or without the support of legislative history, is clear, unambiguous, and directly governs the challenged decision." United Transp. Union-Ill. Legislative Bd. v. Surface Transp. Bd., 183 F.3d 606, 613 (7th Cir. 1999) (quoting Chevron, 467 U.S. at 842).

The Stafford Act does not define "assistance" or "benefits," but "[w]hen a term goes undefined in a statute, [courts] give the term its ordinary meaning." Taniguchi v. Kan Pacific Saipan, Ltd., 132 S. Ct. 1997, 2002 (2012) (citing Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995)); see also Emergency Servs. Billing Corp., v. Allstate Ins. Co., 668 F.3d 459, 465 (7th Cir. 2012) ("In determining whether the statutory language is clear or ambiguous, [courts] are to consider the language itself, the specific context in which that language is used, and the broader context of the statute as a whole, and reference to dictionary definitions is appropriate." (internal quotation marks and citations omitted)). Dictionaries in print around the time of the 1988 amendments to the Stafford Act generally define "benefit" as a payment or something given that is advantageous. See THE OXFORD ENGLISH DICTIONARY VOL. II 112 (2d. ed., Clarendon Press 1989) ("1. To do good to, to be of advantage or profit to; to improve, help forward. 2. To receive benefit, to get advantage; to profit."); THE AMERICAN HERITAGE DICTIONARY 171 (2d. Coll. ed., Houghton Mifflin Co. 1982) ("1. Something that promotes or enhances well-being; advantage. 2. A kindly deed. 3. Payments made or entitlements available in accordance with a wage agreement, insurance contract, or public assistance program."). Assistance is generally defined as "aid" or "help." See THE AMERICAN HERITAGE DICTIONARY at 135; see also THE OXFORD ENGLISH DICTIONARY VOL. I at 715 ("The action of helping or

11

aiding in an undertaking or necessity; furtherance, succor; *also*, the help afforded, aid, support, relief."). While definitions of "benefit" often include some sort of "profit" or "advantage," the definitions for "assistance" as "aid" or "help" take on a more gratuitous connotation, making the words in isolation indeterminate. See Roberts v. Sea-Land Servs., 132 S. Ct. 1350, 1357 (2012). "Statutory language, however, 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" Id. (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989)).

When the duplicate benefits provision is read as a whole, it clearly indicates that benefits or assistance can come from "any other program or from insurance or any other source." 42 U.S.C. § 5155(a) (emphasis added). In defining the terms to include only other government aid and insurance proceeds, the City and the Airlines ignore the full statutory language, omitting entirely the final category of available funds—those from "any other source." Id. However, "[i]t is [the Court's] duty to give effect, if possible, to every clause and word of a statute." Duncan v. Walker, 533 U.S. 167, 174 (2001) (internal quotation marks and citations omitted). Therefore, read in light of the duty to give effect to every word of the statute, the Court finds that the provision is clear and unambiguous in its intent to include funds derived from "any source," including those under the Use Agreements here, as duplicate benefits.

The legislative history and statutory amendments also support this construction. The language of the statute before the 1988 amendments stated that no person or entity "will receive such assistance with respect to any part of such loss as to which he has received financial assistance under any other program." Disaster Relief Act of 1974, Pub. L. No. 93-288, § 315(a), 88 Stat. 143 (May 22, 1974). In 1988, the statute was amended to the language that remains in

12

effect today and at the time of the administrative decisions—"no such person, business concern, or other entity will receive such assistance with respect to any part of such loss as to which he has received financial assistance under any other program or from insurance or any other source." Disaster Relief and Emergency Assistance Amendments, Pub. L. No. 100-107, § 105(a), 102 Stat. 4689 (Nov. 23, 1988) (emphasis added). In amending the statute, Congress not only added insurance specifically, but any other source from which a financial benefit covering the same purpose would derive. Read as a whole, this supports the Court's finding that Congressional intent was clear in not restricting duplicate benefits to other government aid or insurance proceeds.

This interpretation is also consistent with other courts' determinations that payments from private, non-insurance sources can constitute duplicate benefits. In Public Utility District No. 1 v. Federal Emergency Management Agency, the court upheld FEMA's de-obligation of funds to Snohomish County, Washington where it found that a private utility company was responsible for reimbursing the Public Utility District of Snohomish County for its share of the cost of repairing jointly owned utility poles. 371 F.3d 701, 712 (9th Cir. 2004).

In yet another case, FEMA's decision to de-obligate funds as a duplication of benefits was upheld when a private developer purchased damaged homes threatened by landslides following the 1998 El Nino storms. City of Laguna Niguel v. Fed. Emergency Mgmt. Agency, No. 09-0198, slip. op. at 11-14 (C.D. Cal. Sept. 28, 2009). The city had previously received aid from FEMA in order to purchase the homes so that they could be destroyed in order to stabilize the land around them, but the developer subsequently entered into a private settlement agreement with the homeowners to purchase the same homes, thereby creating a duplication of benefits to the city. Id. at 1-4. Similarly, on the basis of a private contract between the City and the

13

Airlines, the Airlines' obligations to pay the net costs of snow removal at O'Hare and Midway constitutes a duplication of benefits as to the funds paid to the City by FEMA.

Because the Court finds that Congress clearly intended that duplicate benefits and assistance can come from "any source," not limited to other government aid or insurance contracts, this ends the matter. Chevron, 467 U.S. at 843. However, to the extent there is any ambiguity, FEMA's interpretation is entitled to considerable deference. Id. In an abundance of caution, the Court addresses the second prong of Chevron.

### 2. *FEMA's Construction of the Stafford Act*

If the duplicate benefits provision of the Stafford Act "is 'silent or ambiguous with respect to the specific issue,' [courts] proceed to the second step, deferring to reasonable agency interpretations of unclear statutory language." United Transp., 183 F.3d at 613 (quoting Chevron, 467 U.S. at 843). "Chevron deference is not abject or rubber stamp deference; agency interpretation of even an ambiguous or silent statute the agency administers will be set aside if unreasonable. Id. (internal quotation marks and citation omitted). The City and the Airlines contend that FEMA's interpretation of the duplicate benefits provision is unreasonable because it would defeat the general purpose of the Stafford Act to force the Airlines, fellow victims of the January 1999 and December 2000 snow disasters, to pay fees to the City when aid was otherwise available from the federal government.

In support, the City and the Airlines point to Congress's intent in passing the Stafford Act, which was "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from such disasters." 42 U.S.C. § 5121(b). The City and the Airlines allege that as major transportation hubs, it was in the interest of the entire county for

14

FEMA to pay to remove the snow from O'Hare and Midway to ensure that air transportation was not devastated. They further point to the definition of public facilities owned by a State or local government that are eligible for aid, which specifically includes an "airport facility." 42 U.S.C. § 5122(9)(A). It is true that a reasonable interpretation of the Stafford Act allows for emergency aid to airports, such as O'Hare and Midway. However, it is not the City-owned airports that FEMA found liable for the duplicate funds at issue; it is the individual Airlines.

The Court is not convinced that national, and in some cases international Airlines—all of which are large corporations—can properly be considered "disaster victims" due to a snow emergency in Chicago, Illinois. In any event, the Airlines' status as disaster victims is irrelevant. The issue is whether it was rational for FEMA to find that the operating and maintenance fees that the Airlines are required to pay under the private Use Agreements with the City can reasonably be construed as duplicate funds under the statute. While the Airlines attempt to distinguish their contracts with the City as "lease agreements," in reality the contracts are no different than any other private contract—including those between an insurer and an insured, which undisputedly fall under the scope of the Stafford Act. The City leases space at O'Hare and Midway to the Airlines. In exchange for taking care of operations and maintenance—including snow removal—the City charges the Airlines a fee as described in the contract. Because the money FEMA paid to the City for snow removal at O'Hare and Midway was covered by the Use Agreements between the City and the Airlines, the Court determines that FEMA's finding of duplicate benefits was a reasonable interpretation of the Stafford Act, and therefore FEMA's findings are entitled to deference. See Hawaii, 294 F.3d at 1165-1166 (finding that Hawaii was responsible to reimburse FEMA for duplicate funds from the insurance proceeds that it received in a commercially reasonable manner for the same purpose); Pub. Util.,

15

371 F.3d at 712 (finding that the public utility company was responsible to reimburse FEMA for duplicate funds that it was entitled to receive from a private utility company that jointly owned the utility poles at issue). Therefore pursuant to the APA, FEMA's decision is upheld on administrative review. Accordingly, FEMA's motions for summary judgment are granted, and the Airlines' and the City's cross-motions for summary judgment are denied.

### III. CONCLUSION

For the foregoing reasons, the Court enters summary judgment in favor of FEMA.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: March 21, 2013